# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CARLOS A. ROSADO, | : | |
| | : | Civil Action No. 15-2152 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |

**WIGENTON**, District Judge:

Presently before the Court is the motion of Carlos Rosado ("Petitioner") to vacate, set aside, or correct his January 2014 conviction. (ECF No. 1). Petitioner filed his motion on or about March 26, 2015. (ECF No. 1). Following this Court's order to answer, the Government filed a response (ECF No. 6), to which Petitioner has replied. (ECF No. 9). For the following reasons, this Court will deny Petitioner's motion as his claims are subject to a binding collateral attack waiver, and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

Petitioner, Carlos Rosado, brings this motion seeking to challenge the sentence he received for his conviction for conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(A), and 846. Petitioner's conviction arose out of his arrest on or about April 23, 2013, following the seizure of eighty seven kilograms of cocaine which were being transported by Petitioner's company. (Document 1 attached to ECF No. 6 at 3). Following his arrest, Petitioner admitted to authorities that he had on several previous occasions transported large shipments of cocaine, and that he knew about the cocaine seized by authorities which had been transported inside of palettes of bananas.

(*Id.*).  Petitioner thereafter cooperated with the authorities by making "approximately 18 recorded telephone calls and one lawfully recorded/monitored meeting with" a member of the drug trafficking organization ("DTO") for whom Petitioner transported cocaine.  (Document 1 attached to ECF No. 6 at 12).  This cooperation enabled authorities to conduct a controlled delivery of the seized cocaine which resulted in the arrest of three members of the DTO: Persio Nunez, Martin Nunez-Lora, and Juan Arias, the apparent leader of the DTO.  (*Id.* at 13).  Authorities were also able to seize a second shipment of cocaine, with the total seizure amounting to 160.41 kilograms of cocaine.  (*Id.*).  Petitioner also provided authorities with translations of the coded conversations that took place during the recorded calls, and information regarding the money laundering activities of the DTO.  (*Id.* at 13, 17-24).

During his initial proffer session in May 2013, Petitioner was also asked about Ralph Mata. (*Id.* at 22).  During that session, Petitioner apparently described Mata as a police officer who was friends with Arias and other members of the DTO who Petitioner met at a store owned by members of the DTO.  (*Id.*).  Although Petitioner was able to tell authorities that Mata was a friend of Arias and company, and that Arias and Mata had once traveled to the Dominican Republic together, Petitioner apparently "could not provide further information" about Mata save for a phone number apparently belonging to Mata.  (*Id.*).

On September 9, 2013, Petitioner signed a plea agreement with the United States Attorney's office for the District of New Jersey.  (*Id.* at 28-36).  Under the plea agreement, Petitioner agreed to plead guilty to the single count for which he was ultimately convicted, and in exchange would be subject to no further criminal charges related to Petitioner's work with the DTO between January 2012 and April 2013.  (*Id.* at 28).  As part of his plea agreement, Petitioner also agreed to a series of stipulations and a waiver of Petitioner's appellate and collateral attack

rights.  (*Id.* at 36-37).  Pursuant to those stipulations, Petitioner and the Government agreed that Petitioner's appropriate guidelines range for sentencing would be either level 33 or 35 depending on a ruling by this Court as to the applicability of U.S.S.G. § 2D1.1(b)(16).  (*Id.* at 35).  Based on those stipulations, Petitioner agreed to the following appellate and collateral attack waiver:

> [Petitioner] knows that he has and, except as noted below in this paragraph, voluntarily waives, the right to file any appeal, collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines range that results from the agreed total Guidelines offense level of 35.  [The Government] will not file any appeal, motion, or writ which challenges the sentence imposed by the sentencing court if the sentence falls within or above the Guidelines range that results from the agreed total Guidelines offense level of 33.  The parties reserve any right they may have under 18 U.S.C. § 3742 to appeal the sentencing court's determination of the criminal history category. The provisions of this paragraph are binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein.  Furthermore, if the sentencing court accepts a stipulation, both parties waive the right to file an appeal, collateral attack, writ, or motion claiming the sentencing court erred in doing so.
>
> . . . Both parties reserve the right to oppose or move to dismiss any appeal, collateral attack, writ, or motion barred by the preceding paragraph and to file or to oppose any appeal, collateral attack, writ or motion not barred by the preceding paragraph.

(*Id.* at 35-36).

Petitioner also signed a cooperation agreement in which Petitioner agreed to fully cooperate with the Government going forward in exchange for a motion for a reduction of sentence by the Government pursuant to U.S.S.G. § 5K1.1.  (*Id.* at 38-41).  In that agreement, Petitioner agreed to "truthfully disclose all information concerning all matters about which [the Government] may inquire."  (*Id.* at 39).  Petitioner also agreed "not [to] commit or attempt to commit any additional crimes."  (*Id.*).  In that agreement, Petitioner also agreed that the "determination [of]

3

whether [Petitioner] has fully complied with [the cooperation] agreement and provided substantial assistance [warranting a 5K1.1 departure motion would] rest[] solely in the discretion of" the Government. (*Id.*). The Government in turn agreed that, if Petitioner complied with the agreement and provided substantial assistance, it would move for a reduced sentence under the Guidelines. (*Id.*). The cooperation agreement also contained a paragraph which set forth that, in the event Petitioner breached any portion of the agreement, including by engaging in criminal activity or giving false information, the Government would be relieved of any and all obligations to file a 5K1.1 motion. (*Id.* at 40).

On September 9, 2013, Petitioner appeared before this Court for a plea hearing where he pled guilty pursuant to his plea agreement. (Plea Tr., Document 1 attached to ECF No. 6 at 49-61). During that hearing, Petitioner admitted his guilt to the crime charged in the Information, and set forth the basis for his plea. (*Id.*). As part of that plea, this Court conducted the following colloquy regarding the appellate and collateral attack waiver in his plea agreement:

> THE COURT: . . . Now, drawing your attention to page 4, [Petitioner], you see the top of that page it says: Waiver of Appeal and Post-Sentencing Rights?
>
> [Petitioner]: Yes.
>
> THE COURT: Now, it cross references Schedule A, which is also a part of your [plea] agreement. And Schedule A begins on page 7. I want to direct your attention in particular to page 8, paragraph 12.
>
> [Petitioner]: Yes.
>
> THE COURT: Okay. In paragraph 12, it goes into detail about the circumstances under which you are voluntarily waiving your right to appeal, collaterally attack, or otherwise challenge the Court's sentence, if I sentence you at the equivalent of a Guidelines offense level of 35 or lower. You understand that?
>
> [Petitioner]: Yes.

> THE COURT: Likewise, as you continue in that paragraph, you will see it indicates that the Government is waiving its right to file an appeal or otherwise challenge the sentence, if I sentence you at a level 33 or higher.  You understand that?
>
> [Petitioner]: Yes.
>
> THE COURT:  So customarily, [Petitioner], everyone has the right to file an appeal.  But based on the provisions set forth in your plea agreement, if these conditions are met, you understand that what's stated in here indicates you will be voluntarily waiving your right to appeal or challenge the Court's sentence if these conditions are met. You understand that?
>
> [Petitioner]: Yes.
>
> THE COURT:  And have you reached this decision to voluntarily waive your right to file an appeal or other challenge to the Court's sentence if these conditions are met, did you reach the decision after consulting with your attorney?
>
> [Petitioner]: Yes.

(*Id.* at 56-57).  Based on this colloquy and the remainder of the plea hearing, this Court concluded that Petitioner was knowingly and voluntarily entering his guilty plea, including the appellate and collateral attack waiver, and therefore accepted Petitioner's guilty plea.  (*Id.* at 60-61).

Following his guilty plea, Petitioner engaged in several proffer sessions with the Government in regard to his further cooperation.  (Document 2 attached to ECF No. 6 at 2-44). The first of those sessions occurred on September 9, 2013.  (*Id.* at 2).  At the first proffer session, the Government asked Petitioner for further details regarding the DTO, which Petitioner largely provided.  As part of those details, Petitioner provided some more information regarding Mata, including that Mata was involved in a plan to smuggle drugs into the country from Ecuador and that Mata was involved with getting the DTO's drugs through customs.  (*Id.* at 3-6).  Petitioner also provided information about his direct co-conspirators, including Juan Arias.  (*Id.* at 2-11). While the proffer session was ongoing, the Government expressed concerns regarding the

truthfulness of some of the information Petitioner provided.  (Defense Counsel's Certification, Document 2 attached to ECF No. 1 at 50).  Petitioner's attorney thereafter spoke with Petitioner and reiterated "the importance of [Petitioner's] answering all of the government's questions honestly and thoroughly," which resulted in Petitioner amending some of his answers.[1]  (*Id.*).

Petitioner returned for a second proffer session the following day on September 10, 2015. During this second proffer session, the Government again took issue with Petitioner's candor. Specifically, Petitioner was asked about a set of bonds Petitioner had purchased in Mexico. (Document 2 attached to ECF No. 6 at 29).  Petitioner stated that he had purchased the set of Mexican bonds for $6,000.00 and intended to sell them.  (*Id.*).  When the Government asserted that these bonds were fraudulent, Petitioner insisted that the bonds were "real" historical bonds and that he had no fraudulent intent in his attempts to sell the bonds.  (*Id.*).  Petitioner was also asked whether anyone in his family was involved in drug trafficking.  (*Id.*).  Petitioner initially stated that none of his family were so involved, but ultimately admitted that his brother-in-law was once arrested for bringing fifteen "roofies" into the country from Mexico.  (*Id.* at 30).  Petitioner insisted, however, that his brother-in-law was not otherwise involved with drugs or money laundering.  (*Id.*).  Records provided by Petitioner appear to show that his brother-in-law was originally arrested on multiple drug related charges regarding his bringing the "roofies" into the country, but those charges were ultimately dropped when the drugs were determined to have been prescribed for his personal use.  (*See, e.g.,* Document 2 attached to ECF No. 1 at 43-47).

---

[1] Defense Counsel does not state whether this side conversation occurred at the September 9 or September 10 proffer session, and neither is it clear from the records the Government provides. The Government, however, asserts that this conversation occurred during the September 9 session.  (ECF No. 6 at 7).

The Government also asked Petitioner during the September 10 session about some other individuals with whom he had come into contact.  The Government specifically asked Petitioner about his actions regarding a former fellow inmate, E.W., who has apparently been involved with real estate fraud.  (Document 2 attached to ECF No. 6 at 30).  Petitioner told authorities that he had met E.W. in jail and had introduced E.W. to his attorney.  (*Id.*).  Petitioner also told the Government that he had sent messages to E.W.'s wife, attorney, friend, and girlfriend on E.W.'s behalf.  (*Id.* at 30-31).  Petitioner stated that E.W. was involved in selling certain properties in Florida.  (*Id.* at 31).  According to the Government summary of the proffer session, Petitioner "initially stated that he did not want to do any business with [E.W., but] subsequently admitted that he had hoped to" help E.W. sell some of his Florida properties.  (*Id.*).  Although the Government argues that Petitioner and E.W. were preparing to enter into a fraud together, Petitioner and his trial counsel have submitted certifications stating that Petitioner believed these sales were legitimate and that Petitioner did not intend to defraud anyone.  (Document 2 attached to ECF No. 1 at 22, 51).  Petitioner was also asked about another associate's involvement with drugs.  (Document 2 attached to ECF No. 6 at 31).  Petitioner first stated that this associate was not involved in drugs, but ultimately changed his answer to state that this associate was involved with drugs, but only for personal use.  (*Id.*).  Based on the perceived contradictions in Petitioner's statements, the Government terminated the proffer session because it did not believe Petitioner was being honest and forthcoming in his answers.  (*Id.*).

Following a request from Petitioner's attorney, another proffer session was held on November 20, 2013.  (Document 2 attached to ECF No. 6 at 36).  During this final session, Petitioner was again asked about the Mexican bonds.  (*Id.* at 42).  According to Government reports, although Petitioner first reiterated his claim that they were legitimate, Petitioner ultimately

admitted that the bonds were without any monetary value, and despite that fact, he was attempting to sell them to collectors for 200 million dollars. (*Id.*). Government records indicate that Petitioner claimed he continued to engage in this scheme to keep one of his co-conspirators from becoming suspicious, and the Government told Petitioner that if he failed to get approval for such activities from the Government, his continued criminal actions would void his cooperation agreement. (*Id.*). In their certifications, Petitioner and his counsel dispute this recollection, claiming that although the Government insisted that the bonds were "a scam," Petitioner insisted to the Government that he believed that the bonds were legitimate. (Document 2 attached to ECF No. 1 at 23-24, 51). Petitioner admits, however, that he did concede to the Government at the proffer session that the bonds may have been worthless forgeries, but he did not believe that to be true as the Government's claims would mean he had been "defrauded of $6,000" he had used to purchase the bonds. (*Id.* at 24). Because the United States Attorney believed that Petitioner continued to lie to the Government, Petitioner's proffer session was again terminated for a lack of candor. (*Id.* at 51).

In accord with the cooperation agreement, the United States Government submitted a letter requesting that this Court reduce Petitioner's sentence pursuant to U.S.S.G. § 5K1.1 on January 9, 2014. (Document 2 attached to ECF No. 1 at 2-6). In its letter, the Government first noted that Petitioner's PSR suggested that the correct guidelines range was between 135 and 168 months based on a total offense level of 33 and a criminal history category of 1. (*Id.* at 2). The Government then recounted Petitioner's early cooperation including the phone calls and controlled deliveries discussed above. (*Id.* at 2-3). In so doing, however, the Government made no mention of Ralph Mata. (*Id.*). The Government thereafter discussed the proffer sessions of September and November 2013 as follows:

> . . . [During the proffer sessions, Petitioner] lied about his past
> criminal activities, including his prior money laundering activities

8

with other criminal associates as well as the sale of fraudulent Mexican "bonds" ([Petitioner] insisted during the September 2013 meetings that the bonds were real, but as set forth in greater detail below, [Petitioner] finally admitted in a subsequent interview that the bonds were fraudulent).   [Petitioner] also lied about being interviewed in the past by law enforcement.  [Petitioner] further lied about the criminal activities of his brother-in-law, initially denying that his brother-in-law was involved in narcotics trafficking, eventually admitting that [he] was aware of his brother-in-law's narcotics trafficking, and then denying – just moments later – that [Petitioner] was aware of his brother-in-law's criminal activities.  Because of [Petitioner's]   lack of candor, the meeting was terminated.  [In a footnote the Government explained that Petitioner was still eligible for a downward departure as his lack of candor pertained only to tangential matters.]

In addition, the government wishes to alert the Court that, during [Petitioner's] cooperation, the government learned that [Petitioner] was attempting to engage in additional criminal activities while on pre-trial supervised release.  The investigation revealed that, while awaiting his initial appearance in New Jersey, [Petitioner] met another prisoner (hereinafter "E.W.") in the holding cell.  [Petitioner] exchanged contact information with E.W.  After his release, [Petitioner] sent messages to several people on E.W.'s behalf.  During the September 10, 2013[,] meeting, [Petitioner] admitted that he had hoped to assist E.W. with finding investors for properties in Florida.  As a result of information obtained during this and other investigations, the government believes E.W. planned to defraud the investors of their money with [Petitioner]'s assistance.  Similarly, during a meeting held at the request of defense counsel in November 2013, [Petitioner] admitted that he was still trying to sell the Mexican "bonds" discussed during the September 2013 meetings.  [Petitioner] finally admitted that he knew the Mexican "bonds" had no actual value, yet he and another criminal associate were still trying to sell the Mexican "bonds" to potential investors at the cost of $200 million.  In fact, [Petitioner] admitted that he had contacted his criminal associate about selling the Mexican "bonds" just the day before the November 2013 meeting.   Ultimately, [Petitioner]'s attempts to engage in these schemes to defraud were futile, and no additional crimes were committed.

In sum, as a result of [Petitioner]'s immediate and extensive cooperation prior to his arrest, the government successfully conducted a controlled delivery of an 80.29 kilogram (net weight) shipment of cocaine to New Jersey, which culminated in the arrests of Persio Nunez and Martin Nunez-Lora.  Moreover, as a result of

the recorded telephone conversations made by [Petitioner], the government also was able to successfully prosecute Alejandro Fernandez-Ventura and Juan Arias, the leader of the drug trafficking and money laundering investigation. Thus, with the assistance of [Petitioner]'s cooperation, the government was able to arrest and prosecute four significant criminals. Furthermore, as a result of the investigation to date, the government has seized over $1 million in assets. Although [Petitioner] is not directly responsible for providing information that led to the seizure of assets, it remains that the four co-conspirators would not have been arrested without [Petitioner]'s cooperation. Based upon the foregoing, [Petitioner] provided substantial assistance to the government. Accordingly, pursuant to Section 5K1.1 of the Sentencing Guidelines, the United States respectfully moves the Court for a downward departure from the otherwise applicable sentencing guidelines range and respectfully requests that the Court impose a sentence upon [Petitioner] that is below the advisory sentencing guidelines range of 135 to 168 months for his conduct. However, the government further respectfully submits that [Petitioner]'s intermittent lack of candor and his attempts to continue his criminal activities while on pre-trial supervised release should be considered by the Court in determining the extent of any downward departure.

(*Id.* at 4-6).

After the filing of the 5K1.1 letter, but in advance of sentencing, Petitioner's trial counsel contacted the U.S. Attorney in charge of Petitioner's prosecution regarding Petitioner's potential sentence. (ECF No. 6 at 10-11; Document 2 attached to ECF No. 1 at 52). During those conversations, Petitioner's counsel apparently requested a sentencing recommendation from the Government. (*Id.*). Although the Government informed counsel that the United States Attorney's Office for the District of New Jersey as a matter of policy does not make sentencing recommendations unless specifically requested to do so by the Court, the U.S. Attorney informed counsel that she believed that a sentence of 60 months would be reasonable in light of Petitioner's cooperation. (*Id.*). Petitioner's counsel apparently took this to mean that the Government would recommend a sixty month sentence, and states in his certification that the Government had stated an intent to so recommend, although the Government states that it had no intention to make a

recommendation other than that in the 5K1.1 letter.[2]  (*Id.*).  Based on his understanding that the Government would recommend a sixty month sentence, Petitioner's counsel elected not to dispute the facts submitted in the Government's 5K1.1 letter in order to avoid any chance that the recommendation would change.  (Document 2 attached to ECF No. 1 at 52).  Petitioner asserts that although he accepted counsel's decision not to file a sentencing memorandum to ensure a recommendation by the Government, Petitioner asserts that counsel never discussed the 5K1.1 letter with him, and he repeatedly asked counsel to argue that he had been honest in dealing with the Government.  (*Id.* at 25).

Petitioner's matter proceeded to sentencing on January 23, 2014.  At sentencing, Petitioner, Petitioner's wife, Petitioner's son, Petitioner's daughter, and Petitioner's corporate lawyer spoke on his behalf, attesting to his general good character.  (Document 2 attached to ECF No. 6 at 46-60).  In addressing this Court, Petitioner made no mention of the information in the 5K1.1 letter, nor did Petitioner attempt to correct the alleged misinformation contained within the letter.  (*Id.* at 59-60).  Petitioner's counsel likewise did not address or correct that information, instead stating that he and Petitioner were "pretty much in agreement with [the Government regarding] just about everything" in the 5K1.1 letter.  (*Id.* at 49).  Petitioner's counsel argued at sentencing that this Court should provide Petitioner with a sentence well below the Guidelines range because Petitioner's cooperation not only aided in the prosecution of several of his fellows, but also exhibited Petitioner's immediate remorse and turning away from criminal behavior.  (*Id.* at 60-64).  In reply, the Government argued that it had only made a 5K1.1 motion because of Petitioner's

---

[2] The Government asserts that there was some confusion during sentencing wherein Petitioner's counsel had also asked for a recommendation that Petitioner serve his sentence at a facility near his family, to which the Government agreed, and Petitioner's counsel mistook this agreement for a statement of intent to recommend a sixty month sentence.  (*See* ECF No. 6 at 13-14).

cooperation, and Petitioner's lack of candor during proffer sessions greatly reduced any value his testimony would have, and did not reflect the good and honest man Petitioner's witnesses had presented in their testimony.  (*Id.* at 65-71).  Based on Petitioner's cooperation, the Government argued that a downward departure was appropriate, but any such departure should be limited because of Petitioner's lack of candor and engaging in further criminal activity while on pre-trial release.  (*Id.*).  This Court did not request a sentencing recommendation from the Government, and the Government made no direct recommendation.  (*Id.*).

In sentencing Petitioner, this Court agreed with the PSR that Petitioner's Guidelines level was a thirty-three and as to Petitioner's criminal history category.  (*Id.* at 71-72).  This Court then recognized that Petitioner's cooperation did merit a downward departure, although any such departure should be limited to reflect Petitioner's questionable conduct following his guilty plea.  (*Id.* at 72-73).  This Court credited the testimony of Petitioner's family on Petitioner's behalf.  (*Id.* at 75-77).  Given the seriousness of Petitioner's crime, however, this Court was unwilling to provide Petitioner with the twenty four month sentence requested by Petitioner.  (*Id.* at 77).  This Court thus was required to balance the facts of Petitioner's case and ultimately settled on a sentence of one hundred and twenty months, a lengthy sentence, but one significantly less than the one hundred and thirty five months Petitioner would have faced without a 5K1.1 motion by the Government.  (*Id.* at 77-80).  In arriving at that sentence, this Court made the following remarks:

> The Court has an obligation to impose sentences that avoid unwarranted sentencing disparities.  Any other individual that is involved to this extent but provides cooperation should be facing essentially the same type of penalty, quite frankly.  And one of the purposes of the Sentencing Guidelines is to avoid unwarranted sentencing disparities.  And so the years of research that have been compiled into the Guidelines, it is certainly information that the Court does reference and certainly uses.  And it uses that in an advisory capacity because it does carry significant research and years of research behind it.

And so as I've indicated at the outset, the difficult question is to what extent does the Court depart? [Petitioner is] essentially safety valve eligible, meaning you don't have any prior criminal record, and so the Court is mindful of that. I do also understand, and as I said, I was likewise troubled . . . in reading the Government's submission about not only [Petitioner] not being truthful, but also some of the activity he was engaging in during the course of his cooperation, and even meeting this individual while he was in custody and potentially getting involved in something additional.

So while everyone says that you will not come back before this Court, [Petitioner], I mean, I hope that's the case. I sincerely hope that's the case. But your actions while you have been under the charges pending here are troubling, quite frankly. They're troubling. I'm happy to find that nothing resulted – nothing resulted from your involvement. But the fact that you were willing to do that in the face of an extremely significant prison term is troubling, quite frankly. And so I'm not here to penalize you for that, but I want you to know that. I read everything. I read everything that I'm provided as relates to the sentencing because it is such a serious thing, and it is something that I take very seriously, and it is not something that I do lightly. And I understand that an entire family is affected every time, and it's not with just you, there are many individuals that come before this Court. And I have read many 5K letters, and I've seen cooperation that goes far beyond this cooperation, and I've seen cooperation that is less than this. But this falls on the lower end of the spectrum, quite frankly, and that's what I certainly – I look at it based on other individuals that have come before this Court and certainly that I am familiar with and the extent and level of their cooperation.

So with that being said, I do think, as I've already indicated, that the sentence I impose will meet the ends of sentencing, and they will . . . deter you, and it will deter others that potentially intend to engage in activity of this nature. And I do also think that given the nature of what occurred here, that the alternatives to incarceration would not . . . support the seriousness of what happened, quite frankly. So if you'll be kind enough to stand, I will impose sentence.

And I would just note at the outset that as I've indicated, the total offense level of 33 as calculated under the presentence report was appropriate. I'm going to depart down two levels. I think that that is commensurate with the level of cooperation provided by Mr. Rosado. And that it also takes into consideration the nature and extent of his cooperation, and is supported by the information that

13

> this Court has received regarding the offense as well as that
> cooperation.  So I am going to depart down to a level 31 under the
> Sentencing Guidelines.
>
> And it will be the sentence of this Court, that pursuant to the
> Sentencing Reform Act of 1984, . . . [Petitioner] will be committed
> to the custody of the Bureau of Prisons to be in prison for a term of
> 120 months.

(*Id.* at 77-80).

Following his sentence, Petitioner filed a notice of appeal, but his appeal was ultimately

voluntarily dismissed in March 2014.  (Docket No. 13-580 at ECF Nos. 18-19).  Petitioner

thereafter filed his motion to vacate his sentence on or about March 26, 2015.  (ECF No. 1).  In

his motion, Petitioner argues that this Court sentenced Petitioner based on material misinformation

in so much as this Court relied on the information in the Government's 5K1.1 letter regarding

Petitioner's behavior in the proffer sessions, and that counsel was constitutionally ineffective in so

much as he failed to correct that information at sentencing.  Petitioner argues that the 5K1.1 letter

was inaccurate as Petitioner asserts that he did not lie, did not engage in criminal conduct after his

plea was entered, and provided information about Ralph Mata which is not reflected in the letter.


## II.  DISCUSSION

### A.  Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging

the validity of his or her sentence.  Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws of
> the United States, or that the court was without jurisdiction to
> impose such a sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral

> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

28 U.S.C. § 2255.  Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure."  *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

## B.  Analysis

### 1.  An evidentiary hearing is not required

A district court need not hold an evidentiary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992).  "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required."  *Judge v. United States*, --- F. Supp. 3d ---, ---, No. 13-2896, 2015 WL 4742380, at *3 (D.N.J. Aug. 11, 2015); *see also Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546.  For the reasons set forth below, Petitioner's claims are barred by the collateral attack waiver contained in his plea agreement.  As such, no evidentiary hearing is required for the disposition of petitioner's motion.

15

**2. Petitioner's claims are barred by the collateral attack waiver contained in his plea agreement**

Petitioner argues in his motion to vacate that his sentence should be vacated because he was denied due process in sentencing in so much as this court allegedly relied on material misinformation supplied by the Government in its 5K1.1 motion and because he suffered ineffective assistance of counsel as a result.  Petitioner, however, pled guilty in this matter pursuant to a plea agreement in which he waived his right to file any appeal or collateral attack as to his sentence not based on this Court's determination of his criminal history category so long as he was sentenced at or below the agreed upon guidelines range, and the Government has moved to enforce that waiver in this matter.  (Document 2 attached to ECF No. 1 at 8).  Petitioner does not dispute that his sentence of one hundred and twenty months' imprisonment is less than the sentence he would have received under the recommended guidelines range, and thus the current attack on his sentence appears to be barred by his appellate waiver.

"A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Fazio*, 795 F.3d 421, 425 (3d Cir. 2015) (quoting *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995)).  The Third Circuit has recently reaffirmed that a criminal defendant's right to file an appeal or collateral attack is one such right which may be waived.  *Id.*  Thus, the courts will "enforce appellate and collateral-attack waivers when they are entered into knowingly and voluntarily and their enforcement does not work a miscarriage of justice."  *Id.*; *see also United States v. Erwin*, 765 F.3d 219, 225 (3d Cir. 2014); *United States v. Khattak*, 273 F.3d 557, 561 (3d Cir. 2001).  As such, a court reviewing a motion to vacate subject to such a waiver must "'decline to review the

16

merits of [the motion]' if [the court] conclude[s] that: (1) the issues raised fall within the scope

of the appellate waiver; and (2) [the petitioner] knowingly and voluntarily agreed to the appellate

waiver; unless (3) enforcing the waiver would 'work a miscarriage of justice.'"  *Erwin*, 765 F.3d

at 225 (quoting *United States v. Grimes*, 739 F.3d 125, 128-29 (3d Cir. 2014)).

   Here, Petitioner agreed to waive his right to any collateral attack as to his sentence, other

than one aimed at challenging this Court's determination as to criminal history category, so long

as he was sentenced to a term within or below the agreed upon total guidelines level of 35, which

equates to a range of between 135 and 160 months.  As Petitioner's motion to vacate expressly

challenges his sentence based on allegations of impropriety by the Court and counsel at

sentencing, his conduct falls squarely within the scope of the waiver in his plea agreement.

Likewise, as Plaintiff was sentenced to 120 months, well below the agreed upon range, the

waiver applies if it was entered into knowingly and voluntarily.  *See Erwin*, 765 F.3d at 225-26.

As such, this court must next determine whether the waiver was knowing and voluntary.

   "In determining whether a waiver of appeal is 'knowing and voluntary,' the role of the

sentencing judge is critical."  *Khattak*, 273 F.3d at 563.  Pursuant to the Federal Rule of Criminal

Procedure 11, the sentencing court is required to inform a criminal defendant of the terms of any

appellate waiver contained in the plea agreement to which he is agreeing and determine that that

defendant understands those terms.  *Id.*  Here, this Court clearly explained to Petitioner that he

would be subject to the waiver contained in his agreement, explained the circumstances under

which Petitioner would be waiving his appellate and collateral attack rights, and determined that

Petitioner clearly understood the terms of his agreement.  (Plea Tr., Document 1 attached to ECF

No. 6 at 56-57).  The record clearly shows that this Court fulfilled its duties under Rule 11 and

that Petitioner understood the terms of the waiver to which he was agreeing.  It is thus clear that Petitioner knowingly and voluntarily waived his rights to appeal.

As Petitioner's arguments in his motion are clearly within the scope of his waiver, and he clearly agreed to that waiver knowingly and voluntarily, Petitioner's waiver of his collateral attack rights bars his current motion unless Petitioner can show that enforcing the waiver under these circumstances would work "a miscarriage of justice in his sentence".  *Fazio*, 795 F.3d at 426.  In determining whether the errors Petitioner asserts amount to a miscarriage of justice, this Court must look to the following factors: "the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result."  *Id.* (quoting *Erwin*, 765 F.3d at 226); *see also Khattak*, 273 F.3d at 563 (adopting the test announced by the First Circuit in *United States v. Teeter*, 257 F.3d 14, 26 (1st Cir. 2001)).  The Third Circuit has suggested that among the types of claims which would establish a miscarriage of justice are those in which a petitioner alleges that counsel was "ineffective or coercive in negotiating the very plea agreement that contained the waiver."  *Fazio*, 795 F.3d at 426 (quoting *United States v. Mabry*, 536 F.3d 231, 243 (3d Cir. 2008).  As Petitioner does not present such a claim here (confining his ineffective assistance claims solely to sentencing as Petitioner does), the question facing this Court is whether Petitioner has shown that the errors he does allege are sufficient to establish that enforcing the waiver would result in a miscarriage of justice.  This will require a brief discussion of each argument raised by Petitioner.

**a.  Petitioner's Due Process argument**

Petitioner first argues that his sentence violates Due Process because it was based upon material misinformation provided by the Government in its 5K letter. The test controlling such claims is set forth in *United States v. Matthews*. 773 F.2d 38 (3d Cir. 1985); *see also United States v. Ciavarella*, 716 F.3d 705, 736 (3d Cir. 2013) (reaffirming that *Matthews* controls where a defendant claims his due process rights were violated by a sentencing court's reliance on "misinformation of a constitutional magnitude"). In *Matthews*, the Third Circuit held that to establish a claim that a petitioner's sentence violated Due Process, the petitioner must show that "misinformation of a constitutional magnitude" was supplied to the sentencing court, and "that misinformation [was] given specific consideration by the sentencing judge." *Matthews*, 773 F.2d at 51; *see also United States v. Barnhart*, 980 F.2d 219, 225-26 (3d Cir. 1992). The petitioner bears the burden of establishing both prongs of this test. *Barnhart*, 980 F.2d at 226. In order to show that misinformation of a constitutional magnitude was supplied to the court, "a [petitioner] must show that he was denied an opportunity to address allegedly false information presented to the judge." *Id.* "[W]here the [petitioner] 'had an adequate opportunity to examine and correct controverted information and request an evidentiary hearing,' but failed to do so, 'the error is counsel's and not the court's." *Id.* (quoting *Matthews*, 773 F.2d at 51).

In this matter, the alleged misinformation about which Petitioner complains was contained in the Government's motion for a downward departure under U.S.S.G. § 5K1.1 and thereafter repeated at sentencing. Petitioner's sentencing counsel received a copy of that letter prior to sentencing, and thus Petitioner had ample opportunity to examine the information and attempt to correct it or request a hearing on that information. Indeed, both counsel and Petitioner spoke during sentencing and neither made mention of the alleged misinformation, nor sought to correct it. Moreover, counsel essentially agreed that the letter was accurate. As such, this Court

did not err to the extent the Court relied on the information provided by the Government. *Barnhart*, 980 F.2d at 226 (quoting *Matthews*, 773 F.2d at 51).  Any error, if error there was, would be counsel's.  *Id.*  Petitioner has therefore failed to establish any Due Process error, let alone one grave enough to warrant nullifying his collateral attack waiver.

**b.  Petitioner's ineffective assistance of counsel claim**

Petitioner's second claim is that counsel was ineffective in so much as he failed to correct the alleged misinformation provided by the Government.  The standard for evaluating such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances.  *Id.*  The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel.  *Id.*  In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge*, --- F. Supp. 3d at ---, 2015 WL 4742380 at *3-4.

Even assuming, *arguendo*, that Petitioner has set forth a *prima facie* case of ineffective assistance of counsel in his motion papers, it does not follow that this Court should permit him to circumvent the collateral attack waiver contained in Petitioner's plea agreement. Although the Third Circuit has suggested that some forms of ineffective assistance of counsel may warrant non-enforcement of a collateral attack waiver, the Court of Appeals has largely limited this suggestion to claims of ineffective assistance of counsel related directly to the negotiation and agreement to the plea agreement containing the waiver. *See Fazio*, 795 F.3d at 426; *Mabry*, 536 F.3d at 243. Petitioner, however, alleges only that counsel failed to correct misstatements of fact at sentencing. Petitioner does not allege that counsel was ineffective in the plea negotiation process, nor in aiding Petitioner to accept the plea agreement. Thus, even if the Third Circuit's

dicta suggestion that ineffective assistance of counsel could warrant the non-enforcement of a collateral attack waiver were binding on this Court, it would not apply to Petitioner's case.

Turning to the balancing test established in *Khattak*, it is clear that Petitioner's claim of ineffective assistance of counsel does not warrant the non-enforcement of Petitioner's collateral attack waiver.  Turning first to the clarity of the alleged error, even giving Petitioner the benefit of the doubt, this Court is at best faced with a case where it is not clear whether the statements made by the Government amount to misstatements of fact, and indeed it would appear that the Government's characterization of Petitioner's actions is not clearly erroneous based on what occurred at the proffer sessions.  Likewise, it is doubtful that this Court would have sentenced Petitioner to a lesser sentence had counsel attempted to correct the Government's statements. Indeed, this Court's statements at sentencing imply quite the opposite: that Petitioner was not penalized based on the information in the letter, and that Petitioner's ultimate sentence was based on the level of cooperation Petitioner provided, which this Court characterized as being on the lower end of the cooperation spectrum.  It is entirely likely that, even had counsel made the arguments Petitioner now raises, this Court's sentence would have been no different.  This suggests that Petitioner has failed to show prejudice, and that his ineffective assistance of counsel claim would fail on the merits were this Court to fully consider it.  *Judge*, --- F. Supp. 3d at ---, 2015 WL 4742380 at *3-4.  Thus, the alleged error here is certainly not "clear," which cuts in favor of enforcing the collateral attack waiver.  *Fazio*, 795 F.3d at 426.  Likewise, as Petitioner's claim is based on a factual dispute between Petitioner's recollection and the records provided by the Government, and not a more grave legal error such as a sentence beyond the applicable guidelines or statutory range, and did not rob Petitioner of the benefit of his bargain (a

sentence below the guidelines range), the character of the error also cuts in favor of enforcement. *Id.*

As this Court has noted, Petitioner received a benefit from his plea agreement, even if it was not as great a benefit as he may have expected.  As it appears that a correction of the alleged erroneous information would not have resulted in the lower sentence Petitioner now suggests, the impact on Petitioner of the alleged error is at best mild.  The impact of correcting the error on the government is at least equal to that on Petitioner.  To correct the alleged error, this Court would have to provide a resentencing to Petitioner, where Petitioner would clearly try to contradict the information contained in the Government's 5K1.1 letter, thus requiring the Government to provide several witnesses to support the assertions in the letter.  Weighing these impacts, it would appear that the impact on Petitioner would be equivalent to that on the Government were he correct that there was ineffective assistance of counsel in this case, thus these two factors appear to balance one another.  As it is unclear to what extent Petitioner acquiesced in the result (in so much as he had an opportunity to present other facts but did not, but now alleges counsel chose to avoid addressing those facts and did not provide him with the information in the 5K1.1 letter), that factor would appear to be neutral.  *See Fazio*, 795 F.3d at 426.

Thus having weighed the *Khattak* factors, this Court concludes that enforcing Petitioner's knowing and voluntary waiver of his collateral attack rights in spite of the alleged ineffective assistance of counsel at sentencing only would not work a miscarriage of justice upon Petitioner. Petitioner received the benefit of his bargain, even if his sentence was not as short as he may have hoped and the alleged error he asserts was within the risk with which his collateral attack waiver was concerned.  As such, Petitioner's waiver is binding and enforceable.  *Id.*  This Court

will therefore enforce the waiver, and will deny Petitioner's motion to vacate his sentence as a result. *Id.*

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c) the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because Petitioner has knowingly and voluntarily waived his right to present the claims he now raises, Petitioner has failed to make a substantial showing that he was denied a constitutional right.  As such, and because jurists of reason would not disagree with this Court's conclusion that the collateral attack waiver should be enforced in this case, Petitioner's claims are not adequate to deserve encouragement.  This Court thus denies Petitioner a certificate of appealability.  *Id.*

## V.  CONCLUSION

For the reasons set forth above, Petitioner's motion is DENIED as barred under Petitioner's appellate and collateral attack waiver, and Petitioner is DENIED a certificate of appealability.  An appropriate order follows.

Dated: January 6, 2016                          *s/ Susan D. Wigenton*
                                                Hon. Susan D. Wigenton
                                                United States District Judge